Kshithij Shrinath
Gina Papera-Ewing
Jenn Rolnick Borchetta
THE BRONX DEFENDERS
360 E. 161st Street
Bronx, NY 10451
Phone: (718) 838-7878

*Counsel for Plaintiff Albert Williams*

Yaacov (Jake) Meiseles
Richad C. Hirani
One Manhattan West
New York, NY 10001
Phone: (212) 735-2441

*Counsel for Plaintiff Albert Williams*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ALBERT WILLIAMS, | ) | |
| | ) | |
| *Plaintiff*, | ) | Civil Case No.: _____ |
| | ) | |
| v. | ) | |
| | ) | |
| THE CITY OF NEW YORK, UNDERCOVER R., | ) | **COMPLAINT AND** |
| and POLICE OFFICERS JOHN DOE #1-8, | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## PRELIMINARY STATEMENT

1.      Plaintiff Albert Williams brings this action to recover for injuries that he suffered when he was beaten by a lawless group of plainclothes officers from the Bronx Narcotics Unit. On November 30, 2020, Williams, a Black man who was then 58 years old, was cornered in his apartment building by an undercover officer who demanded drugs and did not identify himself as law enforcement. Williams tried to run for safety, but the officer chased him out of the building and tackled him to the ground while eight more plainclothes officers descended from three different directions. Pressing Williams against the pavement with his hands pinned behind his back, the officers stomped on him and repeatedly punched and kicked him. Then they dragged him

to the back of their van and—while calling him "n*****"[1] and "cockroach"—they punched him in the groin until he passed out.

2.      This brutal behavior is routine practice for the Bronx Narcotics Unit, which has a history of abusing the rights of Black people. Hundreds of people have filed lawsuits and complaints against officers in that unit for violently attacking and humiliating them—including calling people "pigs" and "addicts," strip-searching people without legal basis, and sexually humiliating them. The lawsuits and complaints reveal a pattern of officers in the Bronx Narcotics Unit using aggressive force against people for no lawful reason. The NYPD's enforcement activities in the Bronx overwhelmingly target Black and brown people, and there is a fair basis to believe that the Bronx Narcotics Unit's violence primarily targets Black and brown people.

3.      The City of New York, meanwhile, seems to have responded to this racialized lawlessness only by doling out millions of dollars to cover up the problem. In lawsuits against the Bronx Narcotics Unit, which comprises only about 100 officers, the City has paid over $5 million in settlements for unlawful force claims since 2013 and over $23 million for all claims involving lawless activity. To date, the city has paid over $300,000 to settle claims against the one officer involved in Williams's beating whose identity is currently known. Yet, despite the public complaints showing patterns of misconduct, and the millions of dollars of taxpayer money paid in settlements, the known officer involved in Williams's case has never been disciplined, and the City has taken no disciplinary action against the most sued officers in the Bronx Narcotics Unit.

4.      Police have targeted Williams his whole life because of his race. The beating he suffered in November 2020 has particularly stuck with him because of, among other things, the

---

[1] Officers used an uncensored version of this racial slur, and its uncensored use was part of the harm inflicted on Plaintiff during this incident. Plaintiff uses the censored term throughout the Complaint to avoid unnecessary repetition of the offensive term.

use of racial epithets, the dehumanization he experienced, and the fact that it occurred in his own home. And it appears that Williams was targeted in part because he struggles with drug use, a struggle that began as a coping mechanism after he was attacked with a knife as a teenager. Drug use is no justification or excuse for the dehumanizing targeting and violence he experienced at the hands of the Bronx Narcotics Unit. Williams should be safe in his own home and his community, as all New Yorkers should be.

5.     The Bronx Narcotics Unit—known for violence and overreach—did not seem to see Williams as a person deserving of safety. Likely looking to score an arrest through a police tactic with little demonstrated success, the unit targeted Williams for a buy-and-bust and tried to force him to make a drug sale. When he did not, and the undercover operation failed, an officer from the unit chased him into the street, where other officers from the Bronx Narcotics Unit then joined in beating and demeaning him.

6.     In beating Williams, the Bronx Narcotics Unit acted as though it has impunity to use excessive force against Black and brown people because the City of New York has sent them the message that they do. By this action, Williams seeks redress for the pain, humiliation, and lasting fear this incident caused him, and with the hope it might help prevent others like him from suffering the same mistreatment.

## PARTIES

7.     Plaintiff Albert Williams is a Black man who grew up in Birmingham, Alabama, attending high school and college there. After graduating from college, Williams was licensed as a painter and practiced his trade around the country. Since about 2011, Williams has lived in the Bronx.

8.      Defendant City of New York is a municipal entity created and organized under the laws of the State of New York. The City is authorized by law to maintain the New York Police Department ("NYPD"). The City's responsibility extends to all NYPD matters including the NYPD's policies, practices, and the conduct of all NYPD personnel including policymakers and employers.

9.      Defendant Undercover R.[2] was a Detective assigned to the NYPD's Bronx Narcotics Unit at the time of the incident and was an undercover officer during the incident. Undercover R. has been an officer with the NYPD since July 1, 2004, and has been a Detective since March 14, 2016. Upon information and belief, Undercover R. has been a member of the Bronx Narcotics Unit since March 2016. Undercover R. is sued in his individual and official capacities.

10.     Defendants John Does 1 through 8 were NYPD officers assigned to the Bronx Narcotics Unit at the time of the incident. They are each described in more detail in the allegations below. John Does 1 through 8 are sued in their individual and official capacities.

## JURISDICTION

11.     This action is brought pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the Constitution of the United States, and Article I, Section 12, of the New York Constitution. Jurisdiction is conferred upon this Court under 28 U.S.C. §§ 1331 and 1343(a)(3), as

---

[2] Plaintiff recognizes that Federal Rule of Civil Procedure 10(a) requires that "[t]he title of the complaint must name all the parties," Fed. R. Civ. P. 10(a), and that the "'use of fictitious names runs afoul of the public's common law right of access to judicial proceedings,' a right that is supported by the First Amendment." *Doe v. Del Rio*, 241 F.R.D. 154, 156 (S.D.N.Y. 2006) (citations omitted). Although Plaintiff does not believe that Defendants have a need to keep the identity of the undercover officer secret that outweighs the public's right to know the name of a government official alleged to have falsely arrested and brutally beaten a member of the public, *see Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 189-90 (2d Cir. 2008); *N. Jersey Media Grp. Inc. v. Doe Nos. 1-5*, No. 12 Civ. 6152 (VM)(KNF), 2012 WL 5899331, at *3-9 (S.D.N.Y. Nov. 26, 2012), to allow Defendants to raise any objections to Plaintiff naming the undercover officer, Plaintiff has used a pseudonym in this Complaint. Plaintiff reserves the right to object to anonymity for the undercover officer—and/or to treating his name or identity as confidential—in any later stage of this litigation, including but not limited to during discovery or in testimony, whether at depositions or trial.

4

this is a civil action arising under the Constitution and laws of the United States. This Court has supplemental jurisdiction over related state claims under 28 U.S.C. § 1367(a).

12.   Venue is proper pursuant to 28 U.S.C. §§ 1391(a), (b), and (c) because all of the events giving rise to Plaintiff's claims occurred in this district.

## FACTUAL ALLEGATIONS

### I.   The Bronx Narcotics Unit's Beating of Williams

13.   On November 30, 2020, at around 10:00 p.m., Williams—then 58 years old and 160 pounds—was in the ground-floor stairwell of the apartment building in which he lived, a few feet from the bottom of the staircase. The stairwell was a private location. After entering the front door of the apartment building, which is generally locked, one would have to turn around a corner, walk down a hallway, and turn around another corner to get to the stairwell.

14.   Defendant Undercover R. appeared at the bottom of the staircase. He was wearing plainclothes and a backpack. He asked Williams to sell him drugs.

15.   Williams did not know or recognize Undercover R., and Undercover R. did not identify himself as an officer.

16.   Williams did not sell Undercover R. drugs.

17.   Instead, Williams asked Undercover R. to leave, but Undercover R. refused and persisted in his request for drugs, his tone growing loud and belligerent.

18.   Williams became afraid. He ran past Undercover R. and out of the building and onto the street. Undercover R. chased him.

19.   The street was quiet. Upon information and belief, there were no other people or cars around.

20.     Undercover R. grabbed Williams from behind and tackled him face down on the pavement. The tackle caused Williams substantial pain.

21.     Undercover R. sat on Williams's back and pulled Williams's arms behind his back.

22.     Williams was pinned under Undercover R. and was unable to move.

23.     Then, in quick succession, a total of eight additional officers arrived on the scene in plainclothes and in three separate unmarked cars, and they proceeded to assault Williams—once while he was prone on the concrete in handcuffs and then again as they held him against the back of a van in handcuffs. At no point did any of the officers, including Undercover R., identify themselves as police. Williams realized these might be police officers after Undercover R. pinned him to the ground. Williams did not resist them at any point; he was cooperative throughout.

24.     The first assault occurred seconds after Undercover R. tackled Williams, when an unmarked car with John Does 1, 2, and 3 pulled up. John Doe 1 jumped from the driver's seat and joined Undercover R. in holding Williams face down against the pavement.

25.     At the same time, John Doe 4 ran to the scene on foot from the opposite direction of the car and joined John Doe 1 in holding Williams face down against the pavement.

26.     Undercover R. stood up from Williams's back and walked a few steps away.

27.     As Undercover R. got up, John Doe 2 ran around the front of the car from the passenger side while John Doe 3, also on the passenger side, ran around the back of the car.

28.     John Does 2 and 3 joined John Does 1 and 4 in holding Williams against the pavement.

29.     All four officers were on top of Williams, who was lying prone and unresisting against the ground with his hands behind his back in handcuffs.

30.     John Does 1, 2, 3, and 4 physically struck Williams.

31.     John Doe 1 punched Williams approximately three times in rapid succession as he held Williams against the pavement.

32.     John Doe 4 kicked Williams and then walked away towards Undercover R. Both Undercover R. and John Doe 4 observed the unreasonable force that the other officers continued to inflict against Williams.

33.     John Doe 2 punched Williams approximately three times.

34.     John Doe 3 stomped on Williams and then pressed his leg down on Williams's body.

35.     John Doe 1 and John Doe 2 then stomped on Williams.

36.     John Doe 2 slammed Williams against the ground.

37.     Together, John Does 1, 2, and 3 continued to press Williams on the pavement while punching and kicking Williams in the head, stomach, arms, legs, and groin.

38.     Williams yelled for help, saying, "Help. Help. Someone help me."

39.     Williams feared he would be killed.

40.     Then, another unmarked police car—driving in the wrong direction down the one-way street—pulled directly in front of the vehicle that had first arrived.

41.     John Doe 5 exited the passenger side and joined John Does 1, 2, and 3 in pinning Williams to the ground.

42.     John Doe 6 exited the driver's side and pinned Williams opposite John Doe 5.

43.     Williams lay pinned and unresisting under the weight of all five men.

44.     Then, a third unmarked police vehicle—a black sprinter van—pulled up and parked behind the first vehicle on scene.

45.     John Doe 7 walked over from the driver's side of the sprinter van, and John Doe 8 walked over from the passenger side.

46.     For a moment, the assault ceased. Williams remained prone and unresisting on the ground, surrounded by nine plainclothes police officers and three unmarked police vehicles, his arms pinned behind his body in handcuffs.

47.     The calm did not last long, however, because then the officers' second assault on Williams began.

48.     Two of the John Doe officers yanked Williams up off the ground by his arms, which were handcuffed behind his back. Williams was completely under their control as they brought him to the back of the van, and he was not resisting the officers.

49.     Five of the John Doe officers pushed Williams against the back of the van, and two of them held him there.

50.     One of the John Doe officers pushed his body against Williams and kneed Williams in the groin, causing Williams to jerk back and forth in pain.

51.     To the right of the first officer, another John Doe officer—a white man who either has short blond hair or is bald—punched and squeezed Williams's genital area repeatedly.

52.     At least two other John Doe officers stood in close proximity watching the assault and did not intervene.

53.     The John Doe officers assaulting Williams shouted repeated racial epithets, including:

    a.   "I hate you N*****s,"

    b.   "You N*****s need to get a job,"

    c.   "All you N*****s do is sell drugs,"

d. "Yeah, you N*****s have big dicks,"

e. "These cracked N*****s are out here on the street, and we need to get them all like cockroaches."

54.     All of the officers on the scene—Undercover R. and John Does 1 through 8—witnessed the excessive and unreasonable force and brutality being used against Williams. They did not intervene at any point. Rather, they facilitated the force by watching idly, yelling epithets, holding Williams against the back of the van, and/or actively inflicting the violence.

55.     With the officers still surrounding him, Williams passed out and slumped forward.

56.     Defendants then threw Williams inside the van.

57.     Williams informed the officers transporting him that his handcuffs were too tight. No officer loosened the handcuffs or in any way addressed his concern.

58.     Williams moaned in pain from the beating that he had just received and requested to see a doctor.

59.     Despite Williams's obvious and articulated need for medical attention, Defendants—including Undercover R. and John Does 1 through 8—did not bring him to the hospital.

60.     Williams was eventually taken to central booking at Bronx Criminal Court. There, Williams was arraigned on the false charge of New York Penal Law section 220.39(1), Criminal Sale of a Controlled Substance in the Third Degree, and other related charges, and bail was set.

61.     The arraignment was based on a criminal complaint sworn to by Officer James Causa, a member of the Bronx Narcotics Unit. Upon information and belief, the criminal complaint contained false information that Undercover R. and John Does 1 through 8 had relayed to Officer Causa.

62.     Williams was unable to post bail and was transported to Rikers Island on December 1, 2020, when the COVID-19 pandemic was still rampant.

63.     Williams's overall physical condition continued to deteriorate. Williams continued to feel throbbing pain in his rib cage, his genital area, and his stomach. In addition, Williams developed extreme chest pain.

64.     On December 14, 2020, Williams was released from Rikers Island.

65.     On February 19, 2021, Williams filed a timely notice of claim.

66.     On April 29, 2022, the criminal charges against Williams were dismissed.

**II.    The Significant and Lasting Injuries to Williams Caused by the Beatings**

67.     As a result of this incident, Williams has experienced lasting physical and emotional harm.

68.     Williams experienced significant pain throughout his body, including in his rib cage, his genital area, and his stomach. For at least a week after the incident, he experienced chest pain.

69.     Williams continues to feel pain in his back, ribs, and his groin area. He has difficulty moving his body from side to side because the pain in his ribs is so acute. Williams continues to feel tightness in his chest. Williams relies on his partner to travel because of the physical pain he feels, which drains his energy and requires him to have support in case he becomes too fatigued.

70.     When Williams was a teenager and living in Birmingham, he was stabbed in his chest. Having experienced lasting distress caused by that stabbing, Williams was understandably fearful and anxious when cornered in his own home by a stranger, Undercover R., and then chased and beaten on the street by people who are supposed to protect him. Now, his fear about being in public is acute. He almost fainted from fear when he was recently in a store with his back to the

door and the door was opened behind him. He has trouble sleeping. He is panicked by the sight of police officers, and seeing officers makes him fearful that they might target, attack, and even possibly kill him. He is hesitant to travel far from his apartment and avoids leaving his apartment at night.

71.     When Williams does leave the apartment, he is almost always accompanied by his partner. When he does leave the apartment alone, his partner calls him every few minutes to make sure that he is okay, because she understands his extreme anxiety. He is particularly anguished by the pain and stress that his beating caused, and continues to cause, his partner.

72.     Williams does not feel safe in his own residence and is afraid of future arrests, because he was approached in his own apartment building and arrested without cause.

73.     Williams is concerned that he will be targeted by Defendants and/or other members of the Bronx Narcotics Unit for excessive force again because he is a Black man who uses drugs.

74.     Williams is also fearful of retaliation for asserting his rights by filing this Complaint. According to a verified complaint, officers in this Unit previously retaliated against an individual who filed a civil-rights lawsuit by unlawfully invading his home and arresting him; the City settled the individual's claim for $230,000.[3] Williams fears that he will similarly face retaliation and targeting from officers of the Bronx Narcotics Unit and other NYPD officers in response to filing this lawsuit.

### III.     The Beating of Williams Is the Result of a Pattern and Policy of Racialized Violence by the Bronx Narcotics Unit

75.     The Bronx Narcotics Unit has been repeatedly accused of excessive and demeaning violence, and available information indicates this violence is racialized and is against mostly or

---

[3] Verified Complaint at ¶¶ 83-84, *Velez v. City of New York*, No. 311529/2011 (Sup. Ct. Bronx Cnty. May 7, 2012).

entirely Black and brown people. Supervisors and high-ranking members of the NYPD would have known of this pattern of misconduct complaints, both because of the extent of the misconduct, which was publicly reported, and because of multiple feedback systems that alert supervisors and high-ranking officials to lawsuits, settlements, and CCRB complaints. These systems were established so that NYPD supervisors and leadership would intervene and correct misconduct that might underpin allegations, even when the claims do not result in findings of liability. Yet despite these systems—and despite the pattern of misconduct within the Bronx Narcotics Unit that would and should have been known to NYPD supervisors and leadership—there is no indication that the NYPD took any meaningful corrective action before the assault on Williams. Conversely, there is evidence the NYPD actively failed to intervene and condoned excessive force, as more specifically alleged below.

### A. The Bronx Narcotics Unit Has a Pattern and Practice of Excessive and Racialized Force.

76.     The NYPD has a widespread problem with excessive force. In the five years prior to the beating of Williams, there were 1,212 lawsuits filed against NYPD officers that alleged the unlawful use of force, according to publicly reported government data from the New York City Law Department.[4] The City paid at least $20 million in settlement payments resulting from these 1,212 lawsuits. Between 2015 and 2020, the City paid $1.1 billion in settlements resulting from NYPD misconduct.[5] In the five years prior to the beating of Williams, the Civilian Complaint

---

[4] *See, e.g.*, *Fernandez v. City of New York*, 457 F. Supp. 3d 364, 374–75 (S.D.N.Y. 2020); *Medina v. City of New York*, No. 19-cv-9412 (AJN), 2020 WL 7028688, at *1 (S.D.N.Y. Nov. 30, 2020); *Gersbacher v. City of New York*, No. 1:14-cv-7600-GHW, 2017 WL 4402538, at *11 (S.D.N.Y. Oct. 2, 2017); *Marlin v. City of New York*, No. 15 Civ. 2235 (CM), 2016 WL 4939371, at *13 (S.D.N.Y. Sept. 7, 2016).

[5] Scott Calvert & Dan Frosch, *Police Rethink Policies as Cities Pay Millions to Settle Misconduct Claims*, Wall St. J. (Oct. 22, 2020), https://www.wsj.com/articles/police-rethink-policies-as-cities-pay-millions-to-settle-misconduct-claims-11603368002.

Review Board ("CCRB") received 12,570 allegations related to excessive force by officers.[6] In that period, the CCRB substantiated at least 720 allegations involving excessive force.[7]

77.     The violence inflicted by the Bronx Narcotics Unit is an acute and racialized manifestation of the NYPD's pattern of excessive force.

78.     Plaintiff has identified over 70 cases against Bronx Narcotics Unit officers that include allegations of unlawful force and show this pattern.[8]

---

[6] *Law Enforcement Lookup*, Legal Aid Soc'y, https://legalaidnyc.org/law-enforcement-look-up (last visited Feb. 21, 2022) (filtered by Date (1/1/2016 to 11/30/2020) and Complaint Category (Force)).

[7] *Id.* (filtered by Date, Complaint Category, and CCRB Disposition (Substantiated of any type)).

[8] Those cases include: *Arbelaez v. City of New York*, No. 17-cv-06543 (S.D.N.Y.) ($170,000); *Morales v. City of New York*, No. 36382/2017E (Sup. Ct. Bronx Cnty.) ($35,000); *Hamed v. City of New York*, No. 301143/2016, 2016 WL 1244628 (Sup. Ct. Bronx Cnty. Mar. 23, 2016) ($55,000); *Virella v. City of New York*, No. 21625/2015 (Sup. Ct. Bronx Cnty.) ($12,500); *Sutton v. City of New York*, No. 29154/2019 (Sup. Ct. Bronx Cnty.) ($40,000); *Olanibi v. City of New York*, No. 34315/2019 (Sup. Ct. Bronx Cnty.) ($75,000); *Reynoso v. City of New York*, No. 22544/2015 (Sup. Ct. Bronx Cnty.) ($17,500); *Marcus v. City of New York*, No. 14-cv-03296 (S.D.N.Y.) ($24,000); *Cruz v. City of New York*, No. 29678/2017 (Sup. Ct. Bronx Cnty.) ($67,838); *Sanchez v. City of New York*, No. 28117/2016 (Sup. Ct. Bronx Cnty.) ($27,500); *Smalls v. City of New York*, No. 21953/2018 (Sup. Ct. Bronx Cnty.) ($45,000); *Jones v. City of New York*, No. 21958/2018 (Sup. Ct. Bronx Cnty.) ($22,500); *Rivera v. City of New York*, No. 17-cv-374 (S.D.N.Y.) (unknown amount); *Roman v. City of New York*, No. 030040/2017E (Sup. Ct. Bronx Cnty.) ($25,000); *Kempson v. City of New York*, No. 027009/2018E (Sup. Ct. Bronx Cnty.) ($30,000); *Garcia v. City of New York*, No. 27657/2020E (Sup. Ct. Bronx Cnty.) (case pending); *Vasquez v. City of New York*, No. 026243/2015 (Sup. Ct. Bronx Cnty.) ($30,000); *Alejo v. City of New York*, No. 026851/2015 (Sup. Ct. Bronx Cnty.) ($30,000); *Gibson v. City of New York*, No. 17-cv-09100 (S.D.N.Y.) ($12,000); *Haughton v. City of New York*, No. 300664/2016, 2016 WL 749747 (Sup. Ct. Bronx Cnty. Feb. 18, 2016) ($10,000); *Johnson v. City of New York*, No. 15-cv-226 (S.D.N.Y.) ($9,000); *Capellan v. Smyth*, No. 15-cv-09815 (S.D.N.Y.) ($40,000); *Prado v. City of New York*, No. 026985/2015 (Sup. Ct. Bronx Cnty.) ($30,000); *Gonzalez v. City of New York*, No. 15-cv-07971 (S.D.N.Y) ($15,001); *Cardona v. City of New York*, No. 300927/2017, 2017 WL 1739344 (Sup. Ct. Bronx Cnty. Apr. 25, 2017) ($110,000); *Perez v. City of New York*, No. 306965-2011 (Sup. Ct. Bronx Cnty.) (unknown amount); *Torres v. City of New York*, No. 301123-2012 (Sup. Ct. Bronx Cnty.) ($29,500); *Serrano v. City of New York*, No. 16-cv-8105 (S.D.N.Y.) ($75,000); *DeJesus v. City of New York*, No. 024175/2018E (Sup. Ct. Bronx Cnty.) ($40,000); *Diabagate v. City of New York*; No. 301879/2016, 2016 WL 3030049 (Sup. Ct. Bronx Cnty. May 19, 2016) ($15,000); *Mangual v. City of New York*; No. 11-cv-01018 (S.D.N.Y.) ($22,500); *Shane v. City of New York*; No. 23654/2019E (Sup. Ct. Bronx Cnty.) ($30,000); *Muhammad v. City of New York*, No. 35400/2019E (Sup. Ct. Bronx Cnty.) (case pending); *Diodonet v. City of New York*, No. 27196/2020E (Sup. Ct. Bronx Cnty.) (case pending); *Salas v. City of New York*, No. 22499/2013E (Sup. Ct. Bronx Cnty.) ($35,000); *Cox v. City of New York*, No. 305759/2013 (Sup. Ct. Bronx Cnty.) ($25,000); *Anthony v. City of New York*, No. 302144/2013, 2013 WL 1438176 (Sup. Ct. Bronx Cnty. Apr. 1, 2013) ($40,000); *Douglas v. City of New York*, No. 14-cv-8377 (S.D.N.Y.) ($25,000); *Cook v. City of New York*, No. 301140/2015, 2015 WL 1296408 (Sup. Ct. Bronx Cnty. Mar. 16, 2015) ($30,000); *Pena v. City of New York*, No. 023414/2016E (Sup. Ct. Bronx Cnty.) ($30,000); *Rowell v. City of New York*, No. 300183/2017, 2017 WL 425195 (Sup. Ct. Bronx Cnty. Jan. 24, 2017) ($75,000); *Boyd v. City of New York*, No. 025217/2019E (Sup. Ct. Bronx Cnty.) ($70,000); *Semiday v. City of New York*, No. 027480/2017E (Sup. Ct. Bronx Cnty.) (case pending); *Gonzalez Crespo v. City of New York*, No. 028983/2018E (Sup. Ct. Bronx Cnty.) ($25,000); *Lazalav v. City of New York*; No. 304048/2015 (Sup. Ct. Bronx Cnty.) ($85,000); *Garcia v. City of New York*, No. 021481/2019E (Sup. Ct. Bronx Cnty.) ($20,000); *Guzman v. City of New York*, No. 031842/2019E (Sup. Ct. Bronx Cnty.) (case pending); *Ramos v. City of New York*, No. 301019-2015

*(cont'd)*

79.     The conduct described in the unlawful force lawsuits allege a pattern of similar misconduct against Black and brown people whereby groups of Bronx Narcotics Unit officers aggressively approach people, physically assault them, use degrading and racialized language, refuse requests for help, and subject people to strip searches, public nudity, and other forms of sexual humiliation.

80.     Examples of these lawsuits include and are not limited to:

i.   A lawsuit filed five months prior to the beating of Williams and settled by the City for $27,500 alleged, in a verified complaint, that Bronx Narcotics Unit detectives repeatedly battered a man and strip searched him without lawful basis.[9]

ii.  A lawsuit the City settled for $27,500 involving an incident from 2018 alleged, in a verified complaint, that Bronx Narcotics Unit detectives punched and kicked a man who was, on information and belief, Latinx, while he was on the ground.[10]

iii. A lawsuit the City settled for $20,000 involving an incident from 2015 alleged that Bronx Narcotics Unit detectives tackled a man who was, on

(Sup. Ct. Bronx Cnty.) ($80,000); *Rivera-Delgado v. City of New York*, No. 022702/2015E (Sup. Ct. Bronx Cnty.) ($35,000); *Phillips v. City of New York*, No. 301380/2016, 2016 WL 1530226 (Sup. Ct. Bronx Cnty. Apr. 8, 2016) ($55,000); *Freeman v. City of New York*, No. 025316/2016E (Sup. Ct. Bronx Cnty.) ($35,000); *Bonilla v. City of New York*, No. 300108/2017 (Sup. Ct. Bronx Cnty.) ($75,000); *Torres v. City of New York*, 031162/2017E (Sup. Ct. Bronx Cnty.) ($30,000); *Bryant v. City of New York*, No. 21534/2018E (Sup. Ct. Bronx Cnty.) ($37,500); *Cherry v. City of New York*, No. 22054/2018E (Sup. Ct. Bronx Cnty.) ($50,000); *Coats v. City of New York*, No. 021400/2018E, 2018 WL 940321 (Sup. Ct. Bronx Cnty. Feb. 5, 2018) ($30,000); *Aybar v. City of New York*, No. 021479/2019E (Sup. Ct. Bronx Cnty.) ($27,500); *Walker v. City of New York*, No. 17-cv-4726 (S.D.N.Y.) ($105,000); *Marcano v. City of New York*, No. 309180/2012 (Sup. Ct. Bronx Cnty.) (unknown amount);  *Solomon v. City of New York*, No. 15-cv-2722 (S.D.N.Y.) ($15,000); *Perry v. City of New York*, No. 13-cv-5973 (S.D.N.Y.) ($12,500); *Dixon v. City of New York*, No. 16-cv-4060 (S.D.N.Y.) ($10,000); *Arauz v. City of New York*, No. 14-cv-6393 (S.D.N.Y.) ($90,000); *Vargas v. City of New York*, No. 305701/2011 (Sup. Ct. Bronx Cnty.) ($35,000); *Rivera v. City of New York*, No. 07-cv-08061 (S.D.N.Y.) ($200,000); *Hortzog v. City of New York*, No. 10-cv-03227 (S.D.N.Y.) ($35,000); *Toribio v. City of New York*, No. 21099/2016E (Sup. Ct. Bronx Cnty.) ($60,000); *Reyes v. City of New York*, No. 22596/2014E (Sup. Ct. Bronx Cnty.) ($35,000); *Jiminez v. City of New York*, No. 0304048/2013, 2013 WL 3379059 (Sup. Ct. Bronx Cnty. June 27, 2013) ($40,000); *Alston v. City of New York*, No. 23054/2016E (Sup. Ct. Bronx Cnty.) ($80,000); *Baldwin v. City of New York*, No. 029897/2018E (Sup. Ct. Bronx Cnty.) ($50,000).

[9] Verified Complaint at ¶ 43, *Pimble v. City of New York*, No. 25608/2020E (Sup. Ct. Bronx Cnty. June 5, 2020).

[10] Verified Complaint at ¶¶ 22-23, *Rosario v. City of New York*, No. 35345/2019E (Sup. Ct. Bronx Cnty. Dec. 27, 2019).

information and belief, Latinx, kneed him in the back and dragged him along concrete.[11]

iv.  A lawsuit the City settled for $75,000 involving an incident from 2015 alleged, in a verified complaint, that Bronx Narcotics Unit detectives forced a man who was, on information and belief, Latinx, to the ground and then hit him in the testicles and punched him in the face.[12]

v.  A lawsuit the City settled for $170,000 involving an incident from 2015 in which Bronx Narcotics Unit detectives allegedly dragged multiple people through an apartment calling them drug addicts and pigs. The people were, on information and belief, Latinx. When one of them began having a seizure, the Bronx Narcotics detectives allegedly laughed and ignored pleas for help.[13]

vi.  A lawsuit the City settled for $22,500 involving an incident from 2014 alleged that Bronx Narcotics Unit detectives detained a Black man in a park without lawful basis and then forced him to pull his pants to his knees and jump up and down, and then one detective searched the man's buttocks— all while members of the public watched. The detectives then allegedly strip searched the man a second time, without lawful basis, at the precinct.[14]

81.  Based on government data publicized by the New York City Law Department, between January 2013 and November 2020, there were 460 lawsuits filed against the approximately 100 officers in the Bronx Narcotics Unit. The City settled 318 of those lawsuits, and the City paid a total of $23,140,356 to the plaintiffs.

82.  At least 121 of those 460 lawsuits were identified by the New York City Law Department as involving the unlawful use of force or a claim of assault and battery. Of those 121 unlawful force cases, the City paid over $5 million to settle 93 of them, based on government data publicized by the New York City Law Department.

---

[11] First Amended Complaint at ¶¶ 33-34, *Barajona v. Simpson*, No. 15-cv-9413 (S.D.N.Y. June 28, 2016), ECF No. 35.

[12] Complaint at ¶¶ 7, 30, *Alvarez v. City of New York*, No. 026492/2016E, 2016 WL 5477433 (Sup. Ct. Bronx Cnty. Sept. 22, 2016).

[13] Complaint at ¶¶ 31-84, *Arbelaez v. City of New York*, No. 17-cv-06543 (S.D.N.Y. Aug. 28, 2017).

[14] Complaint at  ¶¶ 16-28, *Walston v. City of New York*, No. 15-cv-05203 (S.D.N.Y. July 3, 2015).

83.     The media has reported that some of the most sued officers in the NYPD are in the Bronx Narcotics Unit, including but not limited to:

    i.   A Bronx Narcotics Unit detective who has been sued 35 times and for whom the City has paid over $1 million in settlements, including one incident in which he beat a young man that the City settled for $614,500, only for him to be sued another 6 times in 2019 alone; and

    ii.   A Bronx Narcotics Unit detective who has been sued 40 times for excessive force, resulting in $495,000 in settlements;

    iii.   A Bronx Narcotics Unit detective who has been sued 30 times, including for allegedly handcuffing a naked woman and conducting a humiliating strip search of her and her boyfriend, which was alleged to have been racially motivated.[15]

84.     Before the beating of Williams, Undercover R. had been named in at least 12 lawsuits: seven before he was hired into the Bronx Narcotics Unit, and five since he joined their ranks in March 2016. The City paid at least $300,000 settling lawsuits against him.

85.     The lawsuits against Undercover R. repeatedly alleged excessive force and demeaning language, and include but are not limited to:

    i.   A lawsuit that the City settled for $50,000 involving an incident from 2013 that alleged in a verified complaint that Undercover R., with other officers, punched a man repeatedly in the face—leaving an injury over his eye that required multiple sutures—and strip searched him without lawful basis.

    ii.   A subsequent lawsuit that the City settled for $80,000 involving the above 2013 incident that alleged in a verified complaint that Undercover R. and the same group of officers falsely arrested the man in order to head off an Internal Affairs investigation and cover their misconduct.

    iii.   A lawsuit that the City settled for $30,000 involving an incident from 2014 that alleged in a verified complaint that Undercover R., with other officers, beat a man all over his body including beating his head, neck, arms, and legs.

---

[15] Jake Offenhartz, *Here Are NYC's Most Sued Cops Who Are Still On the Job, According to New Public Database*, Gothamist (Mar. 7, 2019), https://gothamist.com/news/here-are-nycs-most-sued-cops-who-are-still-on-the-job-according-to-new-public-database.

iv. Two separate lawsuits that the City settled for $14,000 and $13,000 involving incidents from 2014 that alleged in verified complaints that Undercover R. and other officers unlawfully arrested the plaintiffs.

v. A lawsuit that the City settled for $50,000 involving an incident from 2015 that alleged in a verified complaint that Undercover R., with other officers, aggressively approached a man; used excessive force against him; drove him around for hours refusing his requests for a bathroom until he was forced to defecate on himself; and then strip searched him without lawful basis.

vi. A lawsuit that is still ongoing involving an incident from 2016 that alleged in a verified complaint that Undercover R., with other Bronx Narcotics officers, broke down the door of a pregnant woman's apartment when she was naked; refused to allow her to dress herself; and handcuffed her while she was still naked and refused to allow her to cover herself. Upon information and belief, the woman is Latinx.

vii. A lawsuit the City settled for $13,000 involving an incident from 2017 that alleged in a verified complaint that Undercover R., with other Bronx Narcotics officers, used excessive force and that the City knew from the officers' histories that they had a "bad disposition" and were not suitably trained.

viii. Two lawsuits involving incidents in 2019 where Undercover R., with other Bronx Narcotics officers, used excessive force in falsely arresting the plaintiffs, one of which the City settled for $30,000, and the other for which the status is unknown.

ix. A lawsuit the City settled for $15,000 involving an incident from February 2020—months before the beating of Williams—that alleged in a verified complaint that Undercover R., with other Bronx Narcotics officers, aggressively approached a man; slammed him to the ground; kicked and punched him while he lay prostrate; subjected the person to a prolonged and humiliating strip search; and called him "Little dick."

86. Between January 2013 and November 2020, there were also at least 627 allegations of misconduct against the Bronx Narcotics Unit filed with the CCRB, 163 of which alleged

excessive force.[16] Many of these CCRB complaints also included allegations of vulgar and demeaning language and invasive searches.

87.     Of the 627 CCRB allegations, there were numerous excessive force allegations against Bronx Narcotics officers, including one incident in which Bronx Narcotics officers allegedly pushed and kicked a person in the hospital room to which they had taken him.

88.     Of the 627 CCRB allegations, 59 were substantiated, 263 were unsubstantiated, 96 were exonerated, 39 were unfounded, and 170 were closed for procedural reasons. The only outcomes that suggest no misconduct are those that are exonerated or unfounded, and few were in those categories. Most resulted in outcomes, such as "unsubstantiated," where the subject officer may have committed the misconduct. The CCRB often cannot substantiate allegations because of the unavailability of witnesses and the short period of time they are statutorily given to investigate complaints. Moreover, officers are known to lie to the CCRB, including 181 officers recently found by the CCRB itself to be lying in the course of an investigation.[17]

89.     Undercover R. was the subject of at least six CCRB complaints, including numerous allegations of excessive force that left people with extensive injuries and at least two complaints alleging Undercover R. used excessive force while in the Bronx Narcotics Unit.

**B.   The City Knows About This Excessive Force Problem and Condones It**

90.     The NYPD knew of the allegations in the lawsuits and complaints detailed above that were leveled against officers in the Bronx Narcotics Unit, and yet, based on available

---

[16] *Law Enforcement Lookup*, Legal Aid Soc'y, https://legalaidnyc.org/law-enforcement-look-up (last visited Feb. 21, 2023) (filtered by Date (1/1/2013 to 11/30/2020) and Command (NARCBBX) and Complaint Category (Force)).

[17] Craig McCarthy & Jorge Fitz-Gibbon, *Nearly 200 NYPD cops lied to CCRB—and most were not disciplined*, N.Y. Post (Apr. 11, 2022), https://nypost.com/2022/04/11/nearly-200-nypd-cops-lied-to-civilian-complaint-review-board.

information, it has not taken any meaningful action to intervene. The NYPD has systems that alert higher-ranking officials to allegations against officers and that require them to take corrective action in response, precisely because those allegations can indicate problematic conduct regardless of whether they are proven at trial. Moreover, the misconduct was extensive and publicly reported, such that supervisors and leadership should have known of the repeated allegations and taken corrective action.

91.     Below, Plaintiff more specifically explains both the systems that would have put higher-ranking NYPD officials on notice of the pattern of alleged misconduct and the absence of any discipline or other action that would have prevented Undercover R. and John Does 1 through 8 from beating Williams.

i.   Knowledge

92.     The NYPD tracks lawsuits and CCRB complaints in systems designed to monitor allegations against officers to identify problematic and illegal behavior, prevent misconduct, and reduce costs. The NYPD requires supervisors and high-ranking NYPD officials to review and act upon these allegations, and its systems send alerts to NYPD personnel with responsibility for officer oversight when those allegations meet certain criteria, such as a certain number of complaints.

93.     The NYPD tracks all lawsuits that name an officer in these performance feedback systems, regardless of ultimate outcome, and it includes all CCRB complaints in those systems, even when the CCRB complaints are not substantiated.

94.     When an officer is the named defendant in a lawsuit, multiple divisions in the NYPD are notified. A notification is sent to the NYPD's Internal Affairs Bureau; an entry is placed in the officer's personnel record; the Performance Analysis Section reviews the case; and the

NYPD is supposed to decide whether to put the officer on a civil lawsuit monitoring program, which might include a change of assignment or increased supervision.[18] In addition, since at least 2015, the NYPD's Police Litigation Section tracks allegations of police misconduct,[19] including tracking whether allegations suggest an officer is a risk to commit further misconduct.[20]

95. The NYPD also regularly confers with the Law Department regarding case strategy, outcomes, and settlements when officers are sued.[21]

96. The NYPD is supposed to consider litigation history in taking remedial action toward officers or placing officers in performance monitoring programs.[22]

97. One of the NYPD's automated tracking systems that includes information about lawsuits and CCRB complaints against an officer is the Risk Assessment and Information Liability System ("RAILS"), which is a dashboard of aggregate data that is used by commanding officers and others as a management tool to assess officer performance.[23] Through RAILS, commanders can query an officer's record at any time and receive automatic alerts upon certain triggering events that then require intervention under NYPD policy.[24] RAILS became operational in October 2017, more than three years before the beating of Williams.[25]

---

[18] The Way Forward: The NYPD's Response to the Joint Remedial Process Report at 7, *Floyd v. City of New York*, No. 1:08-cv-01034-AT (S.D.N.Y. June 8, 2018), ECF No. 603.

[19] Off. of the Inspector Gen, for the NYPD, N.Y.C. Dep't of Investigation, *Annual Report 2020*, at 68 (Apr. 2020), https://www1.nyc.gov/assets/doi/reports/pdf/2020/OIGNYPD_SixthAnnualReportFinal_4.9.2020.pdf.

[20] *Id.*; *see* Off. of the Inspector Gen. for the NYPD, N.Y.C. Dep't of Investigation, *Using Data from Lawsuits and Legal Claims Involving NYPD to Improve Policing*, at 16-18 (Apr. 2015), https://www1.nyc.gov/assets/doi/reports/pdf/2015/2015-04-20-Litigation-Data-Report.pdf.

[21] The Way Forward, *supra* note 18.

[22] *Id.*

[23] *Id.* at 4.

[24] *Id.*

[25] *Id.*

98.     As of at least April 2020, six months before the beating, the Police Litigation Section began inputting the data it maintains on lawsuits against officers into RAILS.[26]

99.     RAILS captures all CCRB complaints, regardless of outcome.[27] RAILS sends alerts to the supervising officer, regardless of findings, if an officer has three or more complaints against them in twelve months or six or more in five years.[28] If the complaints allege excessive force, RAILS will send an alert for four or more complaints in the prior two years or five or more force complaints in the prior four years.[29]

100.     The information in RAILS is maintained for the entirety of an officer's employment with the NYPD. It is NYPD policy that RAILS is to be consulted and considered anytime an officer is evaluated and whenever personnel action is being taken, such as transfers or promotions.[30]

101.     NYPD Administrative Guide Procedure No. 329-25 requires commanding officers to regularly log into RAILS and review it for officers under their command. The purpose of this procedure is "[t]o provide commanding officers with an effective means to track the behavior and assess the performance of uniformed and civilian members of the service."[31] The procedure requires commanding officers to design action plans to intervene when a review of RAILS suggests an officer might be engaged in problematic conduct.

---

[26] Off. of the Inspector Gen. for the NYPD, *Annual Report 2020*, *supra* note 19.

[27] The Way Forward, *supra* note 18.

[28] *Id.* at 7-8.

[29] *Id.* at 8.

[30] *Id.* at 8.

[31] N.Y.C. Police Dep't Administrative Guide, Risk Assessment Information Liability System (RAILS), Procedure No: 329-25, at 140 (effective Nov. 18, 2021); https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/public-adminguide2.pdf.

102.   The NYPD's performance evaluation system, which was implemented on January 1, 2017, also includes information on public complaints of officer misconduct and requires regular review of such conduct.[32] The evaluation system requires supervisors to evaluate officers on a quarterly and annual basis.[33] Supervisors are also required to assess officers every month.[34] Each evaluation and assessment requires a supervisor to weigh an individual officer's conduct with 12 dimensions in mind.[35] These dimensions include *integrity*, whether officers have "a sense of duty, moral obligation" and are "not a disciplinary problem";[36] *application of law and procedures*, whether officers "understand[] and appropriately appl[y] the law and Department procedures and guidelines";[37] and *community interaction*, whether officers "engage[] the community in a proactive and positive manner" and treat others with "courtesy and professionalism."[38]

103.   In addition, the NYPD has an Early Intervention Committee that collects and assesses information that is supposed to determine if individual officers require intervention, and this committee reviews, among other information, complaints of officer misconduct. This assessment must include, among other things, an assessment of any lawsuit alleging an unlawful stop or where there is a complaint of racial slurs.[39] Once an officer is in an intervention program, the Committee is supposed to track the number of CCRB complaints and lawsuits naming that

---

[32] Letter from Peter L. Zimroth, Monitor, to Hon. Analisa Torres, *Recommendation Regarding NYPD Performance Evaluation System*, at 5, *Floyd v. City of New York*, No. 1:08-cv-01034-AT (S.D.N.Y. Oct. 20, 2017), ECF No. 562.

[33] *Id.* at 53.

[34] *Id.* at 53-54.

[35] *Id.* at 5; 53-56; 59.

[36] *Id.* at 39.

[37] *Id.* at 40.

[38] *Id.* at 41.

[39] Order, at 8, *Floyd v. City of New York*, No. 1:08-cv-01034-AT (S.D.N.Y. June 2, 2020), ECF No. 767.

officer.[40] The Committee is comprised of high-ranking NYPD officials and, upon information and belief, convenes at least every three months.[41]

104.    Because of these systems, upon information and belief, supervisors and high-ranking officials in the NYPD knew of the custom of Bronx Narcotics detectives using excessive force. Those with such knowledge, upon information and belief, include at least the direct supervisors of the officers named in those lawsuits and complaints, the commanding officer of the Bronx Narcotics Unit, and higher-ranking NYPD officers.

105.    Upon information and belief, through these feedback systems, NYPD Chief of Detectives James Essig and Inspector Lorenzo Johnson would have received information about lawsuits and CCRB complaints against the Bronx Narcotics Unit showing a pattern of problematic excessive force amounting to a practice and policy. With respect to Inspector Johnson, upon information and belief, he would have received this information for at least the three-year period prior to the beating of Williams, because he has been overseeing the Bronx Narcotics Unit since that time.[42]

106.    The knowledge that supervisors and high-ranking NYPD officials should have received includes, at least, 314 lawsuits in the five years prior to the beating of Williams against officers in the Bronx Narcotics Unit—71 of which alleged unlawful force—that the City settled for a total of $17,833,345; and 179 complaints against those officers in the three years prior to the beating filed with the CCRB, including 46 complaints of excessive force.

---

[40] *Id.* at 7.

[41] *Id.* at 6.

[42] *Lorenzo A. Johnson*, 50-a.org (accessed Feb. 18, 2023), https://www.50-a.org/officer/54962.

107.    The knowledge also includes six lawsuits since 2015 against Undercover R. and two CCRB complaints since 2017 against Undercover R.

108.    Because Undercover R. is the only one of nine Bronx Narcotics officers involved in the beating of Williams whose identity is known to the plaintiff, and given the large number of lawsuits and complaints against Bronx Narcotics Unit officers, the City and NYPD likely had knowledge of additional lawsuits and complaints naming the defendant officers and alleging similar excessive force.

109.    Even without these specific feedback systems, publicly reported government data from the New York City Law Department lays bare the repeated and extensive allegations of misconduct against officers in the Bronx Narcotics Unit. Public reports available to the NYPD raised significant concerns about the Bronx Narcotics Unit, including an article months before the beating of Williams that reported that five Bronx Narcotics detectives were among the NYPD's ten most sued officers between 2015 and 2018.[43] In other words: out of the entire police department, half of the most sued officers were in this one unit.

ii.    Indifference and Condonation

110.    Despite supervisors and high-ranking NYPD officials having knowledge of a pattern of misconduct allegations within the Bronx Narcotics Unit, and in disregard of the need for intervention, according to publicly available information, the NYPD has taken no remedial action at all to address, intervene in, or prevent the pattern and policy of excessive and racialized force in the Bronx Narcotics Unit.

111.    According to disciplinary history made public on NYPD Online, the 12 Bronx Narcotics detectives for whom the City appears to have engaged in the most frequent litigation and

---

[43] Offenhartz, *supra* note 15.

who have been named in cases that the City paid substantial sums of money to settle were not disciplined for any of the alleged misconduct.[44]

112.    According to disciplinary history made public on NYPD Online, Undercover R. was not disciplined for the misconduct alleged in any of the 12 lawsuits against him, including the seven before he was hired into the Bronx Narcotics Unit, and he was also not disciplined for the misconduct alleged in the CCRB complaints against him, despite the NYPD's knowledge of those lawsuits and complaints.

113.    According to publicly available information, the NYPD has taken no remedial action at all to address, intervene in, or prevent the pattern and policy of excessive and racialized force in the Bronx Narcotics Unit that would have been evident from the lawsuits, settlements, and complaints detailed above.

114.    This is an acute manifestation of the NYPD's general failure to discipline officers involved in excessive force. Five years before the beating of Williams, the NYPD Office of the Inspector General found that the "NYPD frequently failed to impose discipline even when provided with evidence of excessive force."[45] Yet little changed after the issuance of the report. Between 2015 and 2018, 97 NYPD officers were named in excessive force lawsuits that settled for $100,000 or more; 94 of those officers had no disciplinary history at all, including after the lawsuits settled.[46]

---

[44] *Officer Profile Portal*, https://nypdonline.org/link/2 (last visited Feb. 18, 2023) (specifically, Detectives Mack Lipinski, Wilbert Hernandez, Josue Marcelin, Joseph A. Ruggieri, Jose L. Vargas, Anthony T. Disimone, Daniel Rivera, Jodi Brown, Abdiel R. Anderson, Carlos Marchena, Odalis M. Perez, and Robert L. Simms).

[45] Off. of the Inspector Gen. for the NYPD, N.Y.C. Dep't of Investigation, *Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices*, at 4 (Oct. 1, 2015), https://www.nyc.gov/html/oignypd/assets/downloads/pdf/oig_nypd_use_of_force_report_-_oct_1_2015.pdf.

[46] Chris Glorioso and Kristina Pavlovic, *I-Team: New Discipline Data Reveals NYPD Cops Rarely Penalized for Expensive Lawsuits*, NBC New York (April 14, 2021), https://www.nbcnewyork.com/investigations/i-team-new-discipline-data-reveals-nypd-cops-rarely-penalized-for-expensive-lawsuits/2999713.

115.    Meanwhile, the NYPD lacks obviously needed policies to prevent excessive force within the Bronx Narcotics Unit.

116.    Five years before the beating of Williams, the NYPD Office of the Inspector General found that the NYPD's "use-of-force policy [was] vague and imprecise, providing little guidance to individual officers on what actions constitute force" and that the NYPD's training programs did not "adequately focus on de-escalation."[47] Today, despite some changes, that policy is still insufficient. As the Office of the Inspector General wrote in describing the minimal changes the NYPD made to the guidelines, "The policy does not expressly define 'force' when it is used by an officer, but it does define 'force' when used against an officer."[48]

117.    Additional deficiencies persist. The NYPD's use-of-force policy is, on information and belief, contained within Patrol Guide Procedure No. 221-01 ("PG 221-01"), entitled "Force Guidelines."[49] PG 221-01 provides that officers may use force if other officers in the same circumstances would consider force reasonable to ensure their safety, the safety of the public, or to prevent flight. It then lists eleven factors that should be considered in determining reasonableness, including factors that are vague and varying, such as "actions taken by the subject" and "duration of the action." Rather than carefully delineating the situations in which force is appropriate, the NYPD's use-of-force policy gives officers almost total discretion as to when to use force. Likewise, the NYPD's use-of-force policy does not set forth the maximum use of force

---

[47] Off. of the Inspector Gen. for the NYPD, *supra* note 45, at 3, 4.

[48] Off. of the Inspector Gen. for the NYPD, N.Y.C. Dep't of Investigation, *Annual Report 2017*, at 28 (Mar. 2017), https://www.nyc.gov/assets/doi/reports/pdf/2017/2017-03-31-OIGNYPDAnnualReport.pdf.

[49] *Compare* Patrol Guide, Force Guidelines, Procedure No. 221-01, at 1-2 (date effective June 1, 2016), https://www1.nyc.gov/assets/ccrb/downloads/pdf/investigations_pdf/pg221-01-force-guidelines.pdf *with* Patrol Guide, Force Guidelines, Procedure No. 221-01, at 613 (date effective Sept. 20, 2022), https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/public-pguide3.pdf (demonstrating that force guidelines were largely unchanged between 2016 and 2022, supporting the inference that a largely similar policy was in effect on November 30, 2020).

allowable in response to specific types of conduct. Further, the policy does not contain a requirement for NYPD officers to only use force as a last resort. In fact, it suggests that greater force is generally reasonable against people under the influence of drugs, providing that one factor to be considered is whether the person is "under the influence of a stimulant/narcotic which would affect pain tolerance or increase the likelihood of violence."

118.    PG 221-01's direction that people under the influence can be subject to greater force is obviously problematic in light of the inherently risky nature of buy-and-bust operations, like the one used against Williams, that predictably create conditions that lead to officer violence.

119.    In buy-and-bust operations, an undercover officer attempts to engage someone in a drug sale based on a hunch that the person is using drugs. The undercover officer approaches a person and may ask to buy drugs from that person, may give the person money to buy drugs from someone else, or may themselves offer to sell drugs to the person. At the completion of the fake transaction, a unit of officers descends and arrests the person for possession or sale.

120.    The probability of escalation and risk of harm in buy-and-bust operations is obvious. Operations involving plainclothes officers pose greater threat to the public interacting with the officer. Plainclothes officers have been far more likely to engage in deadly force than other members of the NYPD.[50] Buy-and-busts always start with an officer who is not uniformed approaching a member of the public. When approached by an undercover officer, an individual does not know they are engaging with a police officer. As the Supreme Court has recognized, when officers engage without announcing themselves, "great damage and inconvenience" can result.[51]

---

[50] See George Joseph & Liam Quigley, *Plainclothes NYPD Cops Are Involved in a Staggering Number of Killings*, The Intercept (May 9, 2018), https://theintercept.com/2018/05/09/saheed-vassell-nypd-plain-clothes (finding that, while plainclothes officers make up an estimated six percent of the NYPD force, they commit 31 percent of fatal shooting incidents).

[51] *Wilson v. Arkansas*, 514 U.S. 927, 935-36 (1995).

121.    Moreover, upon information and belief, buy-and-bust operations also commonly target people who struggle with drug addiction and who are sometimes under the influence of drugs when the police target them. This increases the likelihood of negative physical and mental health consequences for the people targeted. One person who was arrested in such an operation said, "For him to put the money in my hands, as an addict, let me tell you what happens. I like to think I could resist it, but I'm way beyond that. My experience has shown me that 1,000 times out of 1,000 times, I will be defeated."[52] Another person openly told an undercover officer that "[w]e got to stop getting high," yet was still targeted by the NYPD's buy-and-bust tactics.[53]

122.    Buy-and-bust operations also primarily target Black and brown people. Although the rates of drug possession, use, and sale by white and Black people are nearly the same, buy-and-bust operations by NYPD officials still disproportionately target Black people.[54] Indeed, the NYPD announced in 2014 that it was ending the use of buy-and-busts for marijuana possession because of the high numbers of Black and Hispanic people targeted by such arrests,[55] yet it has continued buy-and-busts for other types of drug activity despite similar racial targeting and even though buy-and-bust operations secure less contraband than warrant-based operations.[56]

---

[52] Joseph Goldstein, *Undercover Officers Ask Addicts to Buy Drugs, Snaring Them but Not Dealers*, N.Y. Times (Apr. 4, 2016), https://www.nytimes.com/2016/04/05/nyregion/undercover-officers-ask-addicts-to-buy-drugs-snaring-them-but-not-dealers.html.

[53] *Id.*

[54] *See* NYPD Arrests Data (Historic), NYC Open Data, https://data.cityofnewyork.us/Public-Safety/NYPD-Arrests-Data-Historic-/8h9b-rp9u (last visited Feb. 23, 2023). The data shows that, between January 1, 2014 to present, 49.6 percent of people arrested for PL 220.39(1), Criminal Sale of a Controlled Substance in the Third Degree are Black, despite Black people comprising only 23 percent of New York City's population. Upon information and belief, most arrests for this charge are made from buy-and-bust operations.

[55] Shawn Cohen, Larry Celona & Kate Sheehy, *NYPD Halts Marijuana 'Buy-and-Busts,'* N.Y. Post (Nov. 5, 2014), https://nypost.com/2014/11/05/nypd-halts-marijuana-buy-and-busts.

[56] Nirej S. Sekohn, *Redistributive Policing*, 101 J. Crim. L. & Criminology 1171, 1189 (2012), https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=7411&context=jclc.

123.     Upon information and belief, Defendants targeted Williams for a buy-and-bust operation because he is a Black person who uses drugs. Williams began using drugs as a coping mechanism after he was stabbed as a teenager, and he has had challenges with drug use since then. Upon information and belief, Undercover R. and the other officer Defendants believed Williams to use drugs when Undercover R. cornered him in his home and demanded to buy some.

124.     The NYPD's failure to discipline or intervene to prevent excessive force and racialized misconduct by the Bronx Narcotics Unit, and its insufficient policies—when there was an obvious need for sufficient protocols and controls—predictably resulted in the racially biased beating of Williams.

**C. The City Is Liable for the Beating of Williams.**

125.     Plaintiff repeats and re-alleges each of the preceding paragraphs as if set forth fully herein.

126.     Defendant City of New York engages in a policy-in-practice, custom, usage, or practice, of subjecting citizens to excessive force during and after arrests by the Bronx Narcotics Unit. The Bronx Narcotics Unit's practice and custom of officers unlawfully using excessive force during and subsequent to arrests is so persistent, widespread, and pervasive as to constitute a custom or usage and imply the constructive knowledge or acquiescence of the City and its policymakers. The numerous instances of abuse, several of which are described above, along with city agency reports, civilian lawsuits and complaints, and news articles, demonstrate that the City has been, or should have been but for deliberate indifference, aware of the constitutional violations committed by the NYPD and specifically the Bronx Narcotics Unit. The constitutional violations, predicated upon the Fourth and Fourteenth Amendments of the United States Constitution, are so numerous, persistent, and pervasive that the need for corrective action was obvious. The City's

failure to take any such action, through training, enhanced supervision, diligent investigation, or meaningful punishment—in particular, disciplinary action that would deter future misconduct—constitutes deliberate indifference to the violations. This deliberate indifference to the Bronx Narcotics Unit's widespread violations of constitutional rights can be considered a policy, practice, or custom of the City.

127.    The City's failure to supervise, investigate, and discipline Bronx Narcotics Unit officers amounts to deliberate indifference to the constitutional violations committed by the NYPD and officers assigned to the Bronx Narcotics Unit against individuals, including Williams.

128.    Defendant City's improper and inadequate policies, customs, usages, practices, rules and/or regulations were the direct and proximate cause of violations of Plaintiff's civil rights.

## CLAIMS

### Count One: Excessive Force (Fourth Amendment)
42 U.S.C. § 1983
*Against the City and Individual Defendants*

129.    Plaintiff repeats and re-alleges paragraphs 1 through 128, as if fully set forth herein.

130.    Defendants Undercover R. and John Does 1 through 8, individually and collectively, were acting under color of state law when they carried out the acts complained of herein.

131.    The level of force applied by Individual Defendants was objectively unreasonable, excessive, and unjustified, and deprived Plaintiff of his constitutional rights, as guaranteed under 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution.

132.    Defendant City of New York engages in a policy-in-practice, custom, usage, or practice, of subjecting people to excessive force during and after arrests through the Bronx Narcotics Unit.

133.    Defendant City of New York's official policy was the direct and proximate cause of the deprivation of Plaintiff's constitutional rights.

134.    As a result of Defendants' actions, Williams suffered significant physical and emotional pain, humiliation, trauma, and deprivation of his constitutional rights.

135.    Plaintiff seeks compensatory and punitive damages from the City and Defendants Undercover R. and John Does 1 through 8.

### Count Two: Racial Discrimination (Fourteenth Amendment)
42 U.S.C. § 1983
*Against the Individual Defendants*

136.    Plaintiff repeats and re-alleges paragraphs 1 through 135, as if fully set forth herein.

137.    Defendants Undercover R. and John Does 1 through 8 intentionally discriminated against Plaintiff because of his race.

138.    As a result of the actions of Individual Defendants, Plaintiff suffered loss of liberty, humiliation, significant physical and emotional pain and trauma, and deprivation of his constitutional rights.

139.    Plaintiff seeks compensatory and punitive damages from Defendants Undercover R. and John Does 1 through 8.

### Count Three: Failure to Provide Medical Care (Fourteenth Amendment)
42 U.S.C. § 1983
*Against the Individual Defendants*

140.    Plaintiff repeats and re-alleges paragraphs 1 through 139, as if fully set forth herein.

141.    Defendants Undercover R. and John Does 1 through 8 beat Plaintiff so badly that he fainted and faced an unreasonable risk of suffering serious harm to his health—both physical and mental—and extreme pain.

142.    Individual Defendants knew how brutally they beat Williams and saw for themselves the pain that Williams was in following the beatings. Indeed, Williams asked several of the John Doe defendants to take him to the hospital.

143.    Individual Defendants therefore knew or should have known the excessive risk that Williams's injuries posed to his health.

144.    However, Individual Defendants intentionally or recklessly declined to provide Williams with medical care.

145.    As a result of Individual Defendants' deliberate indifference to Williams's need for medical care, Plaintiff suffered significant physical and emotional pain and trauma and deprivation of his constitutional rights.

146.    Plaintiff seeks compensatory and punitive damages from Defendants Undercover R. and John Does 1 through 8.

### Count Four: Failure to Intervene (Fourth and Fourteenth Amendments)
42 U.S.C. § 1983
*Against the City and Individual Defendants*

147.    Plaintiff repeats and re-alleges paragraphs 1 through 146, as if fully set forth herein.

148.    Each of the Defendants had an obligation to intervene to prevent excessive force against Plaintiff and failed to do so.

149.    Each of the Defendants had adequate time to assess and intervene to prevent excessive force against Plaintiff and failed to do so.

150.    Each of the Defendants had an obligation to intervene to prevent racial discrimination against Plaintiff and failed to do so.

151.    Each of the Defendants had adequate time to assess and intervene to prevent racial discrimination against Plaintiff and failed to do so.

152.    As a result of each Defendant's failure to intervene, Plaintiff suffered significant physical and emotional pain, humiliation, trauma, and deprivation of his constitutional rights.

153.    Plaintiff seeks compensatory and punitive damages from the City of New York and Defendants Undercover R. and John Does 1 through 8.

### Count Five: False Arrest (Fourth Amendment)
42 U.S.C. § 1983
*Against the Individual Defendants*

154.    Plaintiff repeats and re-alleges paragraphs 1 through 153, as if fully set forth herein.

155.    Individual Defendants intended to confine Plaintiff and did intentionally confine Plaintiff.

156.    Plaintiff was conscious of the confinement and at no point consented to the confinement.

157.    Individual Defendants had no probable cause to arrest or detain Plaintiff.

158.    All charges were dismissed by the District Attorney on April 29, 2022.

159.    As a result of Individual Defendants' actions, Plaintiff suffered loss of liberty, humiliation, emotional pain and trauma, and deprivation of his constitutional rights.

160.    Plaintiff seeks compensatory and punitive damages from Defendants Undercover R. and John Does 1 through 8.

### Count Six: Fabricated Evidence (Fourteenth Amendment)
42 U.S.C. § 1983
*Against the Individual Defendants*

161.    Plaintiff repeats and re-alleges paragraphs 1 through 160, as if fully set forth herein.

162.    Individual Defendants fabricated evidence of a material nature, likely to influence a jury's decision, and intentionally provided fabricated evidence to prosecutors.

163.    Individual Defendants were acting in an investigatory capacity when they fabricated such evidence.

164.    As a result, Plaintiff suffered a number of injuries set forth herein, including deprivation of his liberty, emotional pain and trauma, and deprivation of his constitutional rights.

165.    Plaintiff seeks compensatory and punitive damages from Defendants Undercover R. and John Does 1 through 8.

### Count Seven: Excessive Force (New York)
N.Y. State Const., art. I, § 12
*Against the City and Individual Defendants*

166.    Plaintiff repeats and re-alleges paragraphs 1 through 165, as if fully set forth herein.

167.    The level of force applied by Defendants Undercover R. and John Does 1 through 8 was objectively unreasonable, excessive, and unjustified, and deprived Plaintiff of his constitutional rights, as guaranteed under article I, section 12 of the New York State Constitution.

168.    Defendant City of New York was at all relevant times the employer of Defendants Undercover R. and John Does 1 through 8.

169.    Defendants Undercover R. and John Does 1 through 8 were at all relevant times acting within the scope of their employment with the City of New York.

170.    As a result of Defendants' actions, Williams suffered significant physical and emotional pain, humiliation, trauma, and deprivation of his constitutional rights.

171.    Plaintiff seeks compensatory and punitive damages from the City and Defendants Undercover R. and John Does 1 through 8.

### Count Eight: False Arrest (New York)
N.Y. State Const., art. I, § 12
*Against the City and Individual Defendants*

172.    Plaintiff repeats and re-alleges paragraphs 1 through 171, as if fully set forth herein.

173.    Defendants Undercover R. and John Does 1 through 8 intended to confine Plaintiff and did intentionally confine Plaintiff.

174.    Plaintiff was conscious of the confinement and at no point consented to the confinement.

175.    Defendants Undercover R. and John Does 1 through 8 had no probable cause to arrest or detain Plaintiff.

176.    Defendant City of New York was at all relevant times the employer of Defendants Undercover R. and John Does 1 through 8.

177.    Defendants Undercover R. and John Does 1 through 8 were at all relevant times acting within the scope of their employment with the City of New York.

178.    As a result of Defendants' actions, Plaintiff suffered loss of liberty, humiliation, emotional pain and trauma, and deprivation of his constitutional rights.

179.    Plaintiff seeks compensatory and punitive damages from the City and Defendants Undercover R. and John Does 1 through 8.

## DEMAND FOR JURY TRIAL

180.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury in this action on all triable issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff hereby requests that the Court:

181.    Award compensatory damages to Plaintiff for economic harm, pain and suffering, emotional and mental distress, and any other recoverable damages in an amount to be determined at trial against the City and Defendants Undercover R. and John Does 1 through 8 jointly and severally, together with interest and costs;

182.    Award punitive damages to Plaintiff in an amount to be determined at trial against Defendants, whose actions constituted outrageous conduct, were reckless and showed a callous indifference to and willful disregard of Plaintiff's rights as set forth above;

183.    Award injunctive relief to Plaintiff in prohibiting Defendants from retaliating against Plaintiff for filing this lawsuit or using excessive force against him during the course of any future interaction;

184.    Order reasonable attorneys' fees and costs to be paid by Defendants pursuant to 28 U.S.C. § 2414 and 42 U.S.C. § 1988; and

185.    Grant such other and further relief as the Court deems just and equitable.


Dated: February 28, 2023
         New York, New York


Respectfully submitted,

| /s/ Kshithij Shrinath | /s/ Yaacov (Jake) Meiseles |
|---|---|
| Kshithij Shrinath | Yaacov (Jake) Meiseles |
| Gina Papera-Ewing | Richad C. Hirani |
| Jenn Rolnick Borchetta | |
| | |
| THE BRONX DEFENDERS | One Manhattan West |
| 360 E. 161st Street | New York, NY 10001 |
| Bronx, NY 10451 | Phone: (212) 735-2441 |
| Phone: (718) 838-7878 | jake.meiseles@probonolaw.com |
| kshrinath@bronxdefenders.org | richad.hirani@probonolaw.com |
| ginamariep@bronxdefenders.org | |
| jennb@bronxdefenders.org | *Counsel for Plaintiff Albert Williams* |
| | |
| *Counsel for Plaintiff Albert Williams* | |